**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

STEPHEN HARIM                         *

    Plaintiff                            *

        v                            *        Civil Action No. DKC-12-1561

WARDEN, et al.                        *

    Defendants                          *
                       ***

## MEMORANDUM OPINION

Pending are Defendants' Motions to Dismiss or for Summary Judgment.  ECF Nos. 26 and 33.  Plaintiff opposes the motions.  ECF No. 38.  A hearing in this matter is not necessary to the disposition of the case. *See* Local Rule 105.6 (D. Md. 2011).

### Background

Plaintiff Stephen Harim ("Harim"), a prison inmate confined at Western Correctional Institution (WCI), claims that on February 17, 2009, approximately two weeks after he arrived at WCI, he was assaulted by staff in housing unit 4.  Harim claims the assault against him was covered up by officers charging him with assaulting staff.  He states that during the incident, a chemical agent was sprayed directly into his mouth, forcing him to ingest a large amount of the spray.  ECF No. 1 at p. 7.

Harim claims that, after ingesting the chemical agent, he began to experience severe stomach cramps and anal bleeding.  He states he filed three sick-call requests regarding the problem in late March 2009 and early April.  Harim states that on April 11, 2009, a notation was made that "stool cards" were negative, but there was no signature, date or provider name noted.  Harim wrote that on May 7, 2009, he had complained of blood from his anus for a couple of months and urgently needed to be seen. *Id*.

In addition to the sick-call slips submitted by Harim, he claims he also complained of health problems to tier officers on all three shifts.  He states the bleeding was becoming more severe and he was experiencing worsening abdominal pain.  On May 9, 2009, he attempted to prove his problem was real to Officer Yommer by showing him "bloody waste" on toilet paper.  Harim states that following this encounter, Yommer wrote a "fictitious infraction" accusing Harim of threatening to throw waste on him.  As a result of the infraction, Harim was placed in a cell without toilet paper or water.  ECF No. 1 at p. 8.

Harim states that on May 10, 2009, he was admitted to the infirmary at WCI for a gastrointestinal (GI) bleed and abdominal pain.  *Id*. at p. 9.  Harim alleges that his condition would not have been as serious if he had not been denied emergency medical care from mid-March 2009 to mid-May 2009.  *Id*. Harim states that on May 19, 2009, he was discharged from the infirmary by Dr. Ottey even though there were no improvements in his symptoms.  *Id*. Harim asserts that Dr. Ottey discharged him because he was angry about his refusal to "sign off" on an administrative remedy (ARP) concerning non-removal of sutures. *Id*. at p. 10.

Harim states that on May 27, 2009, he filed another sick call request complaining of abdominal pain and GI bleeding.  He was seen by physician's assistant (PA) Beverly Sparks on May 29, 2009.  Harim was readmitted to the infirmary and states he showed Diane Windle, R.N. red blood in the toilet with his stool.  Although the nurse noted that Harim's condition was unchanged, a further note states that "the inmate had red juice for dinner." *Id*. at p. 10.

On July 9, 2009, Dr. Hubert Mackel commented in Harim's progress notes regarding the reason for Harim's visit that he had a history of sexual assault and that he is on disciplinary segregation.  Harim alleges the statement is not relevant to his medical condition and was made to simply make him look bad.  *Id*. at p. 11.

From August 28, 2009 through December 31, 2009, Harim continued to file sick call requests as well as ARPs regarding "the complete denial of medical treatment."   *Id*. Additionally, Harim complained about the assault by staff which required sutures for the injury he sustained.  He states he was threatened and told to sign off on his complaints and complied with the request for fear he would be assaulted again.  *Id*.

On May 24, 2009, Harim was given a cat scan which led to a provisional diagnosis of ulcerative colitis.  On August 7, 2009, Harim was sent to the Robinwood Surgery Center for a colonoscopy where Dr. Choudari confirmed the diagnosis.  ECF No.1 at pp. 12- 13.  Following his diagnosis, Harim states he had problems receiving his medication and alleges that records indicating he received them are falsified. *Id*.

Harim claims he was put into cells with other inmates with known violent proclivities in an attempt to cause him bodily harm from May 18, 2010 through August 2, 2010.[1]  *Id*. at p. 13. He states he continued to complain of inadequate medical care by filing ARPs and writing letters to the staff of WCI.

Harim claims that on February 24, 2011, he was stabbed by another inmate while he was handcuffed and housed on segregation.  At the time, Harim was being escorted by an officer and he claims the assault was preventable.  Harim's assailant was also being escorted by an officer and was also handcuffed.  Because both men were on segregation, they were not supposed to have contact with one another. Harim claims his assailant was allowed to carry a weapon and was not secured in his handcuffs, allowing him to escape the cuffs and assault Harim.  ECF No. 1 at p. 15.

---

[1] Harim does not offer any description of events occurring as a result of being housed with violent cellmates during this period of time.

On April 14, 2011, Harim filed an ARP complaining he was in fear for his life because of the assault.  The ARP was dismissed and Harim appealed the dismissal.  On August 10, 2011, Harim's appeal was dismissed by the Commissioner of Correction.  He claims that even though his complaint was dismissed, he remains in the same housing unit where he is assaulted by both staff and inmates.  ECF No. 1 at p. 16.

Harim claims from May through November 2011, he continued to experience "medical problems" that were not addressed by the medical staff at WCI.  On December 7, 2011, Harim was sent to Bon Secours Hospital for a colonoscopy because the first attempt on November 28, 2011, could not be completed.  He was again rescheduled for a colonoscopy in March of 2012.  ECf No. 1 at p. 16.

Harim also claims his mental health needs were not addressed properly.  He claims he has bipolar disorder with severe anxiety, paranoia, racing thoughts, and feelings of helplessness and hopelessness.  He states he experiences "terrible swings from being manic to extreme depression."  ECF No. 1 at p. 17.  Mr. Weber, who works in the psychology department at WCI, has ignored Harim's requests to see a psychiatrist to discuss the medications he should be receiving.  Harim claims that this lack of response has resulted in recurrent nightmares which awaken him in a state of fear.  He alleges he fears being attacked again and that his illness will worsen.  *Id*.

### Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

## Statute of Limitations

"Section 1983 provides a federal cause of action, but in several respects relevant here federal law looks to the law of the State in which the cause of action arose. This is so for the length of the statute of limitations: It is that which the State provides for personal-injury torts." *Wallace v. Kato,* 549 U.S. 384, 387 (2007), *citing  Owens v. Okure,* 488 U.S. 235, 249-250, (1989); *Wilson v. Garcia,* 471 U.S. 261, 279-280, (1985).  In Maryland the applicable statute of

limitations is three years from the date of the occurrence. *See* Md. Cts & Jud. Proc. Code Ann.§ 5-101.  The alleged use of force occurred on February 17, 2009, and the instant complaint was filed on May 24, 2012, more than three years after the incident. ECF No. 1.  The claim is barred by the statute of limitations and must be dismissed.

<u>Medical Claim</u>

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S.294, 297 (1991).  In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff members were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care).  Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839– 40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that

risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).   "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virgiinia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) *quoting Farmer* 511 U.S. at 844.   If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer*, 511 U.S. at 844.   Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); *citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference". *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998).   Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (Actions inconsistent with an effort to hide a serious medical condition, refutes presence of doctor's subjective knowledge).

Defendants Joubert, Ottey, Sparks and Windle ("medical Defendants"), allege Harim's lack of cooperation with treatment is the cause for any delay in treating his ulcerative colitis and that the allegations against them do not state a constitutional claim.   ECF No. 26.   Specifically, medical Defendants state that on February 17, 2009, shortly after Harim arrived at WCI, he was treated for a laceration to his forehead which he alleged was the result of an assault by correctional staff. *Id*. at Ex. 3.   Harim never reported to medical staff that he had ingested pepper spray during his treatment for the laceration. *Id*.   The laceration was two centimeters in

diameter, involved a small amount of bleeding, and required three sutures to close.  *Id*. at Ex. 4. The sutures were removed on March 20, 2009.  *Id*.

Harim first complained of abdominal pain on March 27, 2009, and was treated by Physician's Assistant (PA) Sparks for diarrhea and nausea.  At the time Harim appeared to be in no apparent distress and his abdomen was soft and non-tender.  Harim again made no mention of ingesting pepper spray as the cause for his abdominal discomfort and, upon his request, he was provided with Pepto-Bismol.  ECF No. 26 at Ex. 5 – 6.  Harim returned on March 31, 2009, for complaints of abdominal pain, but was again found to be in no apparent distress and was not experiencing vomiting, diarrhea, constipation, or pain.  *Id*. at Ex. 7 – 8.

On April 6, 2009, Harim reported he was experiencing bloody diarrhea which he attributed to family stress.  Four days later, however, Harim's stool cards were negative for blood and x-rays of his abdomen revealed no abnormalities.  ECF No. 26 at Ex. 10 and 11.  On April 15, 2009, Harim again reported abdominal discomfort, but a physical examination by Dr. Ottey revealed no apparent distress.  *Id*. at Ex. 12.   Emergency treatment was unwarranted.

On May 10, 2009, Harim was seen again by Ottey for his reports of recent weight loss and bright red blood in his stools.  *Id*. at Ex. 15 – 16.   Rectal bleeding was revealed upon examination and Harim was admitted to the infirmary for closer monitoring.  *Id*. at Ex. 17 – 18. On May 13, 2009, Ottey performed an anuscopy[2] examination which revealed signs of bleeding and Harim was prescribed medications for treatment.   *Id*. at Ex. 29 – 30.   Harim, however, refused to take any of the medications provided and became argumentative with medical and security staff.  *Id*. at Ex. 31 – 32.  Dr. Windel had prescribed a suppository for Harim, but he refused to use it, stating he did not know "what his prescription meds are for."  *Id*. at Ex. 33 – 34.

---

[2] Anuscopy is a procedure that allows visual inspection of the rectum.  ECF No. 26 at p. 11, fn. 3.

On May 16, 2009, Harim refused all medications and refused to speak with medical staff. *Id*. at Ex. 38 – 39.   Harim used profanity, became belligerent with staff, and had to be told to dress himself appropriately so that he was not exposed.   *Id*. at Ex. 39.   The following day Harim refused to take psychotropic medications in addition to those prescribed for his abdominal symptoms.   *Id*. at Ex. 41.   On May 18, 2009, Harim did not report experiencing bloody stools; thus, on the following day, Ottey discharged Harim from the infirmary noting that he was in no apparent distress.   *Id*. at Ex. 42 – 45.

On May 29, 2009, Harim reported experiencing blood in his stool and an examination performed on June 2, 2009, confirmed blood in the rectum.   ECF No. 26 at Ex. 46 – 49.   On June 15, 2009, it was discovered that Harim had lost a 30 pounds in recent weeks "without obvious explanation" and had developed a low grade fever.   *Id*. at Ex. 50.   On June 17, 2009, Harim was again admitted to the infirmary by Dr. Ottey and a CT Scan was ordered.   *Id*. at Ex. 52 – 55.   The results of the CT Scan revealed symptoms indicating colitis or inflammation of the colon, which can cause bloody stools.   *Id*. at Ex. 53 and 75.   While confined to the infirmary, Harim contined to be uncooperative with staff, refusing to take medications and becoming belligerent.   On June 28, 2009, Harim not only refused to take medications, he also became irritable and uncooperative with staff, kicking a door and using profanity.   *Id*. at Ex. 61 – 69. Harim continued to be uncooperative with prescribed medical care and at times appeared to be in physical distress.   *Id*. at Ex. 73 – 74 and 80.

In light of Harim's refusal to cooperate with medical exams and his refusal to take prescribed medication, concerns were noted regarding whether he was deliberately starving himself or had an underlying problem.   *Id*. at Ex. 75 – 76.   Despite staff speaking with Harim about his lack of cooperation, he continued to refuse medication on June 29 and 30, 2009.   *Id*. at

Ex. 77 – 79.  In addition, he reported on June 30, 2009, that his appetite had improved and that he was having multiple bowel movements each day.  *Id*. at Ex. 87 – 88.

On July 1 and 2, 2009, Harim continued to refuse to take medications and exhibited mood swings and poor judgment.  *Id*. at Ex. 80 – 86.  On July 8, 2009, Diane Windel, R.N., asked Harim to open his mouth so she could verify whether he had actually swallowed the medication he was given, but he refused.  *Id*. at Ex. 95 – 96.  Although Harim complained of pain on July 10, 2009, he refused the treatment offered to alleviate it.  *Id*. at Ex. 98 – 99. Medical Defendants assert that despite Harim's refusals and bad behavior, they continued to provide care for him.  He was referred to a gastroenterologist on July 1, 2009, and he was referred for a colonoscopy.  *Id.* at Ex. 84.

On July 28, 2009, Harim was seen by Dr. Choudari, a gastroenterologist, who prescribed medications to treat Harim's heartburn as well as a laxative to prepare for a colonoscopy.  ECF No. 26 at Ex. 103 – 104.  Due to Harim's past history of non-compliance, he was closely monitored for compliance with Dr. Choudari's orders on August 6, 2009, to insure a colonoscopy scheduled for the following day could be performed.  *Id*. at Ex. 113 – 14.  The colonoscopy was performed on August 7, 2009, and revealed inflammation in the ascending colon, leading to a diagnosis of ulcerative colitis.  *Id*. at Ex. 115.  To treat Harim's condition, Choudari recommended adding a prescription for Prednisone, a medication used to treat inflammation, and increasing the dosage on his prescription for Asaclo, a drug used to treat inflammation of the colon.  *Id*. at Ex. 116 – 117.  Choudari's recommendations were implemented. *Id*.

On August 12, 2009, Harim reported improvement in appetite and a lessening in rectal bleeding.  A physical examination by PA Sparks revealed no signs of distress or pain.  *Id*. at Ex.

120 – 26.  Harim was discharged from the infirmary on August 18, 2009, because his condition was improving with medication.  *Id*. at Ex. 127 – 28.  On November 3, 2009, Harim had gained 48 pounds and his health was much improved.  *Id*. at Ex. 133 – 34.

Medical Defendants assert that Harim's care continued in 2010 to improve his condition. On January 20, 2010, Harim reported that his condition was being controlled with medication and lab results from January 30, 2010, confirmed no abnormalities.  ECF No. 26 at Ex. 135 and 137 – 139.  A repeat colonoscopy on April 15, 2010, confirmed Harim's diagnosis of ulcerative colitis.  *Id*. at Ex. 140 -41.  His prescription for Asacol was renewed to prevent the return of any pain or symptoms.  *Id*.

Harim's medical follow-up appointments were unremarkable with his improving health noted until June 14, 2010, when he reported to Dr. Joubert that he felt his colitis was flaring up from time to time due to the stress of being placed on segregation.  ECF No. 26 at Ex. 97 and 153-56.  Harim attributed most of the cause for his flare-ups to his segregated confinement[3] but admitted medication provided him with relief.  *Id*. at Ex. 153.  Harim was advised by medical staff that they could not change his housing assignment as that was a decision made by security staff.  *Id*.  During late July and August of 2010, Harim's condition had improved with rectal exams being negative for bloody stools and Harim reporting he was feeling better.  *Id*. at Ex. 154 and 160 – 64.

On September 8, 2010, Harim was treated by gastroenterologist Dr. Robert Chou, who again prescribed Prednisone.  *Id*. at Ex. 167 – 68. Harim reported to Dr. Joubert that he was "feeling pretty good" and requested that Dr. Ottey renew his high calorie diet despite being advised that a low calorie diet would help reduce abdominal pain.  *Id*. aat Ex. 169 – 70.  Through

---

[3] Medical Defendants assert that the remark written in Harim's medical record regarding his past history for sexual assault was made as an explanation for his assignment to segregation.

the remainder of 2010, Harim's condition was monitored on a regular basis and was observed to be stable for periods of time.

Harim's condition remained improved in the beginning of 2011.  He told Dr. Ottey that his abdominal pain was mild and that he could not recall the last episode of rectal bleeding he experienced.  ECF No. 26 at Ex. 179 – 80.  When Harim was offered treatment by Dr. Joubert on March 7, 2011, he refused treatment.  *Id*. at Ex. 185.  He again refused a rectal exam from Dr. Joubert on June 24, 2011, despite his report that he was experiencing blood in his stool.  *Id*. at Ex. 188 – 89.  Harim's condition continued to be monitored and he was offered medical devices which he refused and repeatedly asked for a single cell based on his illness.  *Id*. at Ex. 192 – 209.  Harim was told by PA Sparks, however, that a single cell was not medically necessary for his condition.  *Id*. at Ex. 210.

Harim was approved for another colonoscopy on November 8, 2011, in order to address his complaints of rectal bleeding.  ECF No. 26 at Ex. 211.  The procedure was performed on December 7, 2011, by gastroenterologist Dr. Wondwosen Abdi.  Dr. Abdi recommended that Harim begin using a medication called Cortifoam which is used to treat inflammatory bowel disease.  *Id*. at Ex. 219 – 220.  Harim adamantly refused to use the medication prescribed despite being informed that the medication would heal the inflammation in his bowel.[4]  *Id*. at Ex. 224 – 226.

Harim was approved for a follow-up visit with a gastroenterologist and colonoscopy on February 28, 2012.  *Id*. at Ex. 233.  In March, 2012,[5] new forms of treatment were discussed with

---

[4] Cortifoam is a cortisone foam enema which was prescribed to Harim for twice daily use.  His objection to using the medication was based on the fact that he would have to use it in his cell where his cellmate also lived.  ECF No. 26 at Ex. 224.

[5] Harim's encounter with PA Flury was prompted by his complaint of testicular pain.  Harim refused to allow Flury to perform an examination, accusing Flury of being gay.  ECF No. 26 at Ex. 234.

Harim, including Imuran[6] therapy due to the severity of the colitis and a repeat colonoscopy in one year. *Id*. at Ex. 234.   Harim continued to be treated and seen during April and May, 2012, but refused rectal examinations and, on one occasion, became "increasingly agitated and left the exam room." *Id*. at Ex. 240 – 41.

In his opposition,[7] Harim states that his condition was ignored until he was so ill he could hardly stand and he was removed from a strip cell via medical cart at the intervention of Dr. Ottey.  He states this occurred on May 19, 2009, after he had repeatedly asked for help from tier officers who ignored him and threatened him with further punishment if he did not stop bothering them.  When he arrived in the infirmary he was placed on an IV, was suffering "major stomach pain," the worst diarrhea of his life, and had lost over 30 pounds of weight.  ECF No. 38 at Att. 3, pp. 1 – 4. With respect to the allegation that he refused medications, Harim states that he never "refused meds that would help" him and explains that medication and food made his stomach pain worse.  *Id*. at p. 5.   He further alleges that nurses would refuse to give him medication, food, or his high calorie drinks until he complied with orders to use a suppository in front of them.  *Id*.  He claims he was forced to use the suppositories even when he had bloody diarrhea and that correctional officers looked on while he was required to use them.  *Id*.  He further alleges he was not kept informed about his diagnosis by treating physicians and even when he was told about the colitis diagnosis it was not explained to him.  *Id*. Harim also takes issue with the fact that colonoscopy results addressed to him were not provided to him until he obtained a copy of his medical record on his own.  *Id*. at p. 6.

---

[6] Imuran (azathioprine) is an immunosuppressive antimetabolite used to treat rheumatoid arthritis and given to kidney transplant patients to prevent rejection of the donor organ.  http://www.drugs.com/pro/imuran.html

[7] Harim's opposition consists mainly of exhibits documenting the complaints he filed regarding his care, correspondence from an attorney at Prisoners Rights Information System, and an outside doctor's independent review of the care he is receiving.  ECF No. 38.  He does not provide an affidavit or declaration under oath in support of his claims.

Other portions of Harim's opposition undermine his claim that he received inadequate medical care. Harim contacted Prisoners Rights Information System (PRISM) for assistance with obtaining medical care. His case was reviewed by David Donovan, M.D, .a doctor used by PRISM to review claims of this type, who commented that:

> It is interesting that Mr. Harim has made absolutely no complaints about his colitis in 2010. H-Pylori test was negative. Zantac was given. Despite the lack of complaints, Mr. Harim is convinced that he is not receiving proper treatment. I think he is disturbed because Dr. Choudari, a gastroenterologist, submitted his resignation as Mr. Harim's physician. I believe that Dr. Ottey at DOC has done a good job as a replacement.

ECF No. 38 at Att. 5, p.1. Dr. Donovan further concluded that the prison medical staff was providing adequate care in Harim's case. *Id.*

It is beyond question that ulcerative colitis is a serious medical condition as evidenced by the symptoms exhibited by Harim. Medical Defendants' position that Harim's lack of cooperation with medication prescribed means his condition was not serious is specious, given the apparent lack of communication[8] and privacy he was provided. Notwithstanding the seriousness of his condition, treatment was provided once it was determined his condition was serious. The missed diagnosis when he first reported symptoms is not an adequate basis for a finding of deliberate indifference to his serious medical needs. Harim does not dispute that he was eventually provided care and the medical records support a finding that he has received extensive monitoring of his condition, including several colonoscopies as well as medication to address his condition. In short, once the seriousness of his condition was recognized and a provisional diagnosis made, appropriate medical care was provided. While the allegation that Harim was not educated about his condition or told about his diagnosis is troubling, the Eighth

---

[8]  It is unclear whether the lack of communication was caused by Harim's own belligerence and his admitted "obnoxious behavior" (ECF No. 1 at p. 1), or simply the result of a shortage of time to provide it given the number of prisoners requiring care. In either case, that failure is not dispositive of the constitutional claim.

Amendment does not require medical care providers to provide treatment that is beyond reproach. It merely prohibits unnecessary and wanton infliction of pain or suffering, a standard that does not encompass ordinary medical malpractice. Harim has failed to establish sufficient facts from which a jury could conclude that the Eighth Amendment was violated by medical Defendants, entitling them to summary judgment in their favor.

Psychological Care

There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *See Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir. 1977). A prisoner is entitled to such treatment if a "[p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Id.* The *Bowring* court further concluded that the aforementioned right to such treatment is based upon the essential test of medical necessity and not upon that care considered merely desirable. *Id.* at 48.

Harim claims he suffers from bipolar disorder, but is not being treated for the condition. ECF No. 1 at p. 17. Specifically, he claims Mr. Weber, who works in the psychology department at WCI, has ignored his requests to see a psychiatrist to discuss the medications he should be receiving. Harim alleges he experiences severe mood swings and that the lack of response by Weber has resulted in recurrent nightmares which awaken him in a state of fear. *Id.*

Defendant Shane Weber, a Mental Health Professional Counselor Supervisor at WCI, states that Harim was first interviewed for purposes of assessment on February 3, 2009, the date

he arrived at the institution.  ECF No. 33 at Ex. 2.  The initial interview ended prematurely due to Harim's behavior, but he was seen again two days later, at which time Weber referred Harim to a psychiatrist for assessment and medication management.  *Id*.  On February 12, 2009, Harim was seen by Dr. Stephen Schellhase, a psychiatrist who prescribed medications to treat Harim's reported symptoms.  Harim was treated by Schellhase until July 2011, when Harim refused two consecutive appointments for medication evaluation.   The prescribed medication was discontinued based on Harim's refusals and he was advised he would have to contact Psychology Department staff to be assessed prior to any additional referrals being made.  On October 25, 2011, Harim requested a renewal of his medication, but reported no symptoms warranting medication and exhibited no "active Axis I symptomology."  *Id*.  Based on the absence of symptoms, no referral was made to the psychiatrist.

Weber again interviewed Harim on November 16, 2012, when he claimed he was having difficulty sleeping.  Harim's reported symptoms were vague and he did not claim to have any other problems or complaints; thus, Weber determined that a referral to the psychiatrist was not warranted.  ECF No. 33 at Ex. 2.  Harim was also interviewed by another member of the Psychology Department on January 23, 2012, when Harim claimed he had a serious medical condition that requires him to be single celled.  He presented no mental health issues at the time of this interview.  *Id*.  On June 26, 2012, Harim again reported experiencing anxiety, but the counselor with whom he spoke observed no significant levels of anxiety during the interview. He persisted with requests to be referred to psychiatry so he could resume taking medication and he was referred to psychiatry for a follow-up appointment to determine if medication is warranted.

Harim was seen on July 12, 2012, by Dr. Schellhase for an assessment of his need for medication.  Weber notes that Harim is well known to the staff members and has a history of manipulative behavior and attempts to intimidate others in order to achieve his goals.  It is the opinion of the staff that Harim does not have an Axis I disorder such as bipolar disorder, but rather has an Axis II personality disorder.  ECF No. 33 at Ex. 2, p. 2.  When Harim was interviewed by Schellhase he appeared to be attempting to obtain a diagnosis of bipolar disorder so it would be on his record when he is released from prison.  When his attempt to obtain the diagnosis was unsuccessful, he threatened Schellhase with legal action and further attempts to discuss the topic with Harim have been unsuccessful.  Schellhase concluded that there was no clear evidence to support a diagnosis of an Axis I disorder and that Harim had no clear need for psychiatric medication.  *Id.*

It is clear that Harim's claim against Weber is based on his disagreement with the refusal to diagnose him as he believes is appropriate.  There is no objective indication that Harim is being refused treatment for a serious psychiatric disorder.  To the extent Harim disagrees with the treatment he is receiving, that disagreement is not a basis for an Eighth Amendment claim.

<u>Failure to Protect Claim</u>

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Plaintiff must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm.  *See Pressly v. Hutto*, 816 F. 2d 977, 979 (4th Cir. 1987). "Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency.   Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825,

833– 34 (1994) (citations omitted).  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id* at 837; s*ee also Rich v. Bruce*, 129 F. 3d 336, 339– 40 (4th Cir. 1997).

Previously, this court denied preliminary injunctive relief to Harim after he alleged his life was in danger while assigned to disciplinary segregation, based on evidence that two inmates who had assaulted Harim were no longer housed near him, were listed as his enemies, and the assaults that occurred were spontaneous.  ECF No. 10.  Harim alleges that he was put into cells with other inmates with known violent proclivities in an attempt to cause him bodily harm from May 18, 2010 through August 2, 2010 (ECF No. 1 at p. 13); he was assaulted by another inmate during an escort from disciplinary segregation on February 24, 2011, while he and his assailant were restrained (*id* at p. 15); and his ARP complaint filed on April 14, 2011, concerning his fear for his life was dismissed (*id*. at p. 16).

Correctional Defendants assert Harim's allegations are unfounded.  The assault that occurred on February 24, 2011, which is the only specific incident alleged by Harim,[9] was a spontaneous assault for which the officers present had no warning.  ECF No. 33.  Moreover, they state that the incident was thoroughly investigated and the prisoner who assaulted Harim was placed on his enemies list.  *Id*. at Ex. 3, 12L and 12 M.  At most, the incident amounts to negligence on the part of the officers escorting Harim and his assailant.  The only evidence offered by Harim to support the allegation that the officers knowingly allowed the assault is his

---

[9] Harim's allegation that he was housed with violent inmates is vague and insufficient to state an Eighth Amendment claim.

observation that this type of incident had happened on a prior occasion.  Harim admits, however, that prisoners slip their handcuffs on occasion.  ECF No. 1 at p. 15.  Harim's speculation does not amount to sufficient evidence to draw an inference that the assault was knowingly permitted to occur.

With respect to the ARP Harim alleges was improperly dismissed, Correctional Defendants provide a copy of the ARP,[10] which was dismissed because Harim stated in an interview regarding the complaint that he was "fine for now."   ECF No. 33 at Ex. 12M (Attachment 16 at pp. 125 – 132).  The investigative report accompanying the ARP response reports that Harim felt his safety was in danger because the "gangs are after him." *Id*. at p. 128.  Additionally, it was noted that Harim's claim there was a contract issued on his life by the gang known as Dead Men Incorporated (DMI) was being investigated by the Internal Investigation Unit; that he admitted his current cell mate presented no danger to him; and upon release of his cell mate from segregation a screening process would insure a new cell mate would not be a known threat to Harim's life.  *Id*. at p. 129.  Harim's appeal to the Commissioner of Correction was dismissed on procedural grounds, but it was also noted that there was no evidence he was currently in danger of being harmed.  *Id*.  at p. 131.

Harim's claim that there was a failure to protect him from the violence of other prisoners is without merit and Correctional Defendants are entitled to summary judgment in their favor on this claim.

---

[10]   A declaration under oath from Jeffrey Shimko, the ARP Officer at WCI, reflects that Harim has filed "an abundance of ARP's from 2009 until present."  ECF No. 33 at Ex. 12 (attachment 16 at p. 1).  Shimko further states that in his opinion Harim's extensive use of the Administrative Remedy Process is an attempt to manipulate staff for his personal gain.  *Id*.

Retaliation Claim

In order to prevail on a claim of retaliation, Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).   It is unclear how much of a showing of adversity must be made in order to survive a motion for summary judgment.   Compare *Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986) ("complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death" sufficient to state claim).   "'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'"   *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim).

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann,* 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

*ACL U of Maryland, Inc. v. Wicomico County*, Md.  999 F.2d 780, 785 (4th Cir. 1993).

"In the prison context, we treat such claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) quoting  *Adams v. Rice*, 40 F.3d 72,74 (4th Cir. 1994).

To the extent that Harim intended to raise a claim of retaliation, the claim is unsupported by any evidence and amounts to a bald allegation.  The dismissal of Harim's ARP complaints were the result of investigations made into his claims which revealed they were unfounded, and his claim that medical care was withheld is unsupported by the record.  ECF No. 33 at Ex. 12 and ECF No. 26.  Defendants are entitled to summary judgment on this claim.

### Conclusion

The court finds there are no genuine disputes of material fact warranting a trial on the merits of the claims asserted.  A separate Order granting summary judgment in favor of all Defendants as explained herein follows.


Date:   January 22, 2013                              /s/
                                        DEBORAH K. CHASANOW
                                        United States District Judge